**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

ALICIA CALDERON,

Plaintiff,

v.

ROYAL ELITE PALACE CATERERS LLC, ALEXANDRA HIAEVE, ABA COHEN a/k/a ABA KOLNOV a/k/a ABA KOIUNOV, ROBEN KATANOV, and YURI YONAYEV.

Defendants.

**Case No. 1:21-cv-6367 (EK) (MMH)**

**Proposed Amended Complaint**

**Plaintiff Demands A Trial By Jury**

Plaintiff Alicia Calderon, by and through her attorneys, Law Office of Jillian T Weiss, P.C., and Make the Road New York, as and for her Complaint against Defendants Royal Elite Palace Caterers LLC, Alexandra Hiaeve, Aba Cohen a/k/a Aba Kolnov a/k/a Aba Koiunov, Roben Katanov, and Yuri Yonayev alleges as follows:

## Preliminary Statement

1. This is an action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.; the Fair Labor Standards Act, 29 U.S.C. § 201 et seq.; the New York State Human Rights Law, N.Y. Exec. Law § 296 et seq.; New York Labor Law, and its accompanying regulations and orders of the New York State Department of Labor; and the New York City Human Rights Law, N.Y.C. Admin. Code § 8-107 et seq.

2. For nearly two and a half years as an employee of the catering company and event space commonly known as Royal Elite Palace, Plaintiff Alicia Calderon experienced escalating and unrelenting discrimination and harassment because of her gender and gender expression by the employees, operators, owners, and managers of Royal Elite Palace.

3. Ms. Calderon seeks declaratory, injunctive, and equitable relief, as well as monetary damages, to redress Defendants' unlawful employment practices, including their discriminatory treatment and harassment based on her gender and gender expression, and their unlawful retaliation against her after she complained about the discrimination and harassment she experienced.

4. Furthermore, Defendants failed to properly compensate Ms. Calderon for all of the work she performed as a cook at the same catering company and event space, Royal Elite Palace. Defendants (1) never paid Ms. Calderon overtime compensation at one-and-one-half times her regular rate of pay for time worked each week in excess of forty (40) hours; (2) never paid her spread-of-hours pay at the minimum wage rate for workdays lasting over ten hours per day, as required by state law; and (3) violated myriad other state laws.

5. Ms. Calderon seeks unpaid wages, liquidated damages, and other monetary damages to redress Defendants' willful and systematic violations under the Federal Labor Standards Act (FLSA) and relevant state laws and regulations.

**Parties**

6. Ms. Calderon is a 29-year old transgender woman of Latin American descent.

7. Ms. Calderon is a resident of Jackson Heights, New York.

8. Ms. Calderon was employed by Defendant Royal Elite Palace Caterers LLC ("Royal Elite Palace") and/or its predecessor, Elite Palace LLC d/b/a Elite Palace as a cook in the kosher kitchen of its event space from July 3, 2014 to on or about June 21, 2019.

9. At all times relevant to this action, Ms. Calderon was a non-exempt employee of Defendant Royal Elite Palace within the meaning of the Federal Labor Standards Act ("FLSA"), New York Labor Law ("NYLL"), Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §

2000e(f), the New York State Human Rights Law ("NYSHRL"), NYSHRL § 292(6), and the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8-102(5).

10. Ms. Calderon's primary and native language is Spanish.

11. Defendant Royal Elite Palace Caterers LLC d/b/a Royal Elite Palace ("Royal Elite Palace") became an active New York Corporation on July 3, 2014, with its principal place of business located at 6902 Garfield Avenue, Woodside, New York 11377, and its office address registered as 20 West 47th Street, Suite 205, New York, New York 10036.

12. Upon information and belief, Royal Elite Palace was dissolved on or about December 7, 2020.

13. Upon information and belief, Defendant Alexandra Hiaeve was an owner of as well as employed by Royal Elite Palace as an accountant and has managed the company's finances at all times relevant to this action.

14. Upon information and belief, Defendant Aba Cohen a/k/a Aba Kolnov a/k/a Aba Koiunov was an owner, shareholder, officer, director, managing agent and/or principal of Royal Elite Palace and/or Elite Palace at all times relevant to this action.

15. Upon information and belief, Defendant Roben Katanov was an owner, shareholder, officer, director, managing agent and/or principal of Royal Elite Palace and/or Elite Palace at all times relevant to this action.

16. Upon information and belief, Defendant Yuri Yonayev was an owner, shareholder, officer, director, managing agent and/or principal of Royal Elite Palace and/or Elite Palace at all times relevant to this action.

17. Upon information and belief, each of Alexandra Hiaeve, Aba Cohen a/k/a Aba Kolnov a/k/a Aba Koiunov, Roben Katanov, and Yuri Yonayev, had the power to control, and did in fact

control, Royal Elite Palace and its employees and managed the day-to-day operations of the company.

18. Upon information and belief, individual Defendants Alexandra Hiaeve, Aba Cohen a/k/a Aba Kolnov a/k/a Aba Koiunov, Roben Katanov, and Yuri Yonayev are all residents of New York State.

19. For brevity and to preserve titles the individual defendants are referenced herein collectively as the Individual Defendants or individually as follows: Alexandra Hiaeve ("Ms. Hiaeve"), Aba Kolnov ("Mr. Kolnov"), Roben Katanov ("Mr. Katatnov"), and Yuri Yonayev ("Mr. Yonayev.

20. At all times relevant to this complaint, Shalom Dezoraiev was employed by Royal Elite Palace as head chef of the event space's kosher kitchen, where he directly supervised Ms. Calderon.

21. At all relevant times, Jose Ariza was employed as a cook in the kosher kitchen and worked on a daily basis with Ms. Calderon.

22. At all relevant times, Mr. Dezoraiev also directly supervised Mr. Ariza.

23. Defendants are engaged in commerce as defined by 29 U.S.C. § 203.

24. Upon information and belief, Defendants have a gross volume business of not less than $500,000 per year.

25. At all times relevant to this action, Defendants were "employers" of Ms. Calderon within the meaning of the FLSA and NYLL.

26. At all times relevant to this action, Ms. Calderon was an "employee" of Defendants within the meaning of the FLSA and NYLL.

27. At all times relevant to this action, Defendants "employed" Ms. Calderon within the meaning of the FLSA and NYLL.

28. Ms. Calderon consents in writing to becoming a party plaintiff in this action (see Exhibit 1, attached).

## **Procedural History**

29. On November 27, 2019, Plaintiff Calderon filed a claim for unpaid wages with the New York State Department of Labor ("NYSDOL").

30. The NYSDOL issued to Ms. Calderon a Notice of Complaint Received on December 30, 2019, thereby tolling Ms. Calderon's claims under the New York Labor Law from the date of filing with the NYSDOL, pursuant to NYLL § 198(3).

31. On April 15, 2020, Ms. Calderon filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC").

32. The Charge of Discrimination named Royal Elite Palace as Respondent.

33. The Charge of Discrimination alleged violations of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e et seq.; the New York State Human Rights Law, N.Y. Exec. Law § 296 et seq.; and the New York City Human Rights Law, N.Y.C. Admin. Code § 8-107 et seq.

34. Ms. Calderon filed an Amended Charge of Discrimination with the EEOC on January 20, 2021, adding Elite Palace LLC, and 6902 Garfield Avenue LLC as Respondents.

35. On August 18, 2021, Ms. Calderon received a Notice of Right to Sue, attached hereto as Exhibit 2.

36. Ms. Calderon took all necessary steps to exhaust her administrative remedies as to her federal claims under Title VII.

37. Ms. Calderon took all necessary steps to fulfill all conditions precedent to the commencement of this lawsuit.

## Jurisdiction and Venue

38. This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because the action is based on Title VII of the Civil Rights Act, 42 U.S.C. § 2000e et seq., and 29 U.S.C. § 201 et seq. of the Fair Labor Standards Act ("FLSA").

39. The Court has jurisdiction over Ms. Calderon's pendant state law claims under 28 U.S.C. § 1367 (supplemental jurisdiction). Ms. Calderon's state law claims are parts of the same case or controversy as her federal claims.

40. Venue is proper in the United States District Court for the Eastern District of New York under 28 U.S.C. § 1391(b)(2) because a substantial part of the unlawful employment practices is alleged to have been committed in Queens, New York, which is within the Eastern District of New York.

41. Venue is proper under 42 U.S.C. § 2000e-5(f)(3) because the unlawful employment practices are alleged to have been committed in Queens, New York, which is within the Eastern District of New York

42. Defendants reside and/or do business in this District.

## Facts – Claims under Title VII, NYSHRL, and NYCHRL

***Ms. Calderon was a cook for Royal Elite Palace and Mr. Dezoraiev supervised her from her hiring in summer 2013 to her termination on or about June 21, 2019.***

43. In summer 2013, Royal Elite Palace[1] hired Ms. Calderon as a cook in its kosher kitchen.

[1] For purposes of brevity, Elite Palace LLC and Royal Elite Palace Caterers LLC are hereinafter referred to collectively as the business's assumed name, "Royal Elite Palace." Defendant Royal Elite Palace Caterers LLC was incorporated in 2014 and is the successor of Elite Palace LLC. When referring to one of these corporate entities specifically, they will be referenced by their full legal name.

44. Elite Palace LLC was a New York Corporation with its principal place of business located at 6902 Garfield Avenue, Woodside, New York 11377.

45. At all times relevant to this action, Elite Palace LLC was a for-profit catering company that provided food and a large event space for weddings and other private gatherings.

46. At all times relevant to this action, Elite Palace LLC employed fifteen (15) or more employees, all of whom were hired to work in one or the other of two kitchens–the kosher kitchen or the regular kitchen–or as hosts, servers, or bussers in Elite Palace's event space.

47. Elite Palace LLC was dissolved on or about July 3, 2014.

48. Defendant Royal Elite Palace Caterers LLC d/b/a Royal Elite Palace ("Royal Elite Palace") became an active New York Corporation on July 3, 2014, with its principal place of business located at 6902 Garfield Avenue, Woodside, New York 11377, and its office address registered as 20 West 47th Street, Suite 205, New York, New York 10036.

49. Defendant Royal Elite Palace provided substantially the same business and operations of Elite Palace as a catering company and event space, and maintained substantially the same personnel (exceeding 15 employees), equipment, and methods of production as its predecessor.

50. Upon information and belief, Royal Elite Palace is a successor corporation to Elite Palace LLC.

51. Ms. Calderon was and remains qualified for the job she held as cook.

52. Ms. Calderon's work for Royal Elite Palace was labor intensive and included tasks such as lifting and carrying large pots or platters of food, operating an industrial slicing machine for cutting meat, and transferring boxes of food and other heavy items from one part of the kitchen to the other.

53. Ms. Calderon also routinely cleaned the kitchen to prepare for the next day.

54. Throughout Ms. Calderon's employment, her supervisor, Mr. Dezoraiev, regularly told her that she was an excellent employee and that he was grateful for the quality of and care for her work.

55. Mr. Dezoraiev often praised Ms. Calderon for her cooking skills and made positive comments about the dishes she prepared for Royal Elite Palace's clients.

***Defendants began harassing Ms. Calderon when she began her gender transition***

56. In January or February 2017, Ms. Calderon began to adjust her gender expression to match with her gender identity, a process commonly known as "gender transition."

57. Ms. Calderon began growing out her hair as well as wearing makeup and more feminine clothing to work every day.

58. Many coworkers noticed the gradual changes in Ms. Calderon's appearance and began making disapproving comments to her or gossiping about her with other coworkers.

59. Ms. Calderon frequently observed her coworkers staring at her while she worked.

60. One day soon after she began the transition process, Mr. Dezoraiev called Ms. Calderon into his office. There he told her that some of her coworkers had been talking about her new "look," which Ms. Calderon understood meant her decision to express herself as a woman. Ms. Calderon responded, "this is my decision. I live for myself and no one else," or words to that effect. She explained that her choices in how she presented herself were personal decisions and need not inhibit her ability to complete her work.

61. Around this same time, Ms. Calderon's coworker, Jose Ariza, started regularly interrogating Ms. Calderon as to why she would want to wear makeup or grow out her hair and often made belittling comments to her in front of other coworkers.

62. Each time Mr. Ariza asked such a question or made such a comment, Ms. Calderon responded, “Porque tiene que cambiar. Ésta es mi decision, y a ti no te importa mi decision” (in English, “Because I have to change [my expression]. This is my decision, and my decision shouldn’t mean anything to you”) or words to that effect.

63. Mr. Dezoraiev, who was empowered to act on behalf of the corporate Defendant Royal Elite Palace, had the power to direct Mr. Ariza to cease making these remarks, but did not do so.

64. Mr. Ariza began recruiting other male coworkers to join him in openly mocking Ms. Calderon’s appearance. These coworkers included Armando, Mario, Silvino, and Marcos (last names unknown), among others.

65. Ms. Calderon often observed Mr. Ariza approaching Armando, Mario, Silvino, and Marcos and speaking to them in a loud voice about what she was wearing that day so that everyone could hear. He would then encourage these coworkers to join him in laughing at or taunting her.

66. At other times, Mr. Ariza and Armando, Mario, Silvino, and Marcos huddled together in an area not far from where Ms. Calderon was working and snickered about her clothes or makeup or pointed at her in a jeering manner.

67. Mr. Ariza and Armando, Mario, Silvino, and Marcos continued to bully Ms. Calderon about her appearance on a regular basis for the remainder of her employment at Royal Elite Palace.

68. Mr. Ariza’s, Armando’s, Mario’s, Silvino’s, and Marcos’s comments and jeering looks directed to Ms. Calderon made her feel extremely anxious at work.

69. Ms. Calderon avoided being in the same area as Mr. Ariza and the other male workers who joined him in harassing her.

70. Mr. Dezoraiev was aware of Mr. Ariza’s, Armando’s, Mario’s, Silvino’s, and Marcos’s bullying comments and jeers, because he could see and hear what was happening.

71. Mr. Dezoraiev, who was empowered to act on behalf of the corporate Defendant Royal Elite Palace, had the power to direct Mr. Ariza to cease making these remarks, but did not do so.

72. Ms. Calderon began wearing headphones at work so that she could listen to music in an attempt to drown out her coworkers' comments or name-calling and carry out her work in peace.

73. When Ms. Calderon appeared not to hear their comments, Mr. Ariza would leave the group and approach Ms. Calderon on his own, put his face within inches of hers, and tell her that she was not acting as a man should act, or that it was absurd for her to act as a woman, because "if you are a man you're a man, and if you're a woman you're a woman" or words to that effect.

74. Sometimes, Mr. Ariza demanded an answer from Ms. Calderon as to why she wanted to be a woman, and she would simply say, "Me estoy cambiando para mi, para complacerme" (in English, "I'm transitioning for me, to make me feel good") or words to that effect.

75. By the summer of 2017, Mr. Ariza's comments were so frequent and aggressive that Calderon began fearing for her safety at work.

76. On an almost daily basis, Mr. Ariza would call Ms. Calderon vulgar names from across the kitchen so that everyone else could hear, including Mr. Dezoraiev.

77. Mr. Ariza would daily go out of his way to pass by Ms. Calderon in the kitchen so that he could call her a "puta" (in English, "bitch") or "maricon" (in English, "fag"), or tell her that she was "muy fea" (in English, "very ugly"), or that she and other transwomen were all "whores" who "les gusta andar en prostitución en las calles de Jackson Heights" (in English, "want to prostitute themselves out on the streets of Jackson Heights") or words to that effect.

78. Ms. Calderon spoke with Mr. Dezoraiev about these incidents of verbal abuse.

79. Mr. Dezoraiev was almost always in the kosher kitchen directly supervising the work and thus, directly witnessed or was aware of the harassment that Ms. Calderon suffered even before she spoke with him.

80. The derogatory insults and name calling Calderon suffered continued up until the end of her employment at Royal Elite Palace.

***Mr. Ariza later began to physically harass Ms. Calderon.***

81. Mr. Ariza began to physically harass Ms. Calderon around the time she started wearing a brassiere to work.

82. One day at the end of Ms. Calderon's shift, after most of the other coworkers had left, Mr. Ariza approached her while she was pulling a tray out of the kitchen oven and groped her breast while commenting mockingly, "que tu tienes allí?" (in English, "what do you have there?").

83. Ms. Calderon immediately pulled away in shock and screamed, "¡déjame! ¡No me toque o te voy a echar!" (in English, "Leave me alone! Don't touch me, or I'll throw this on you!"), referring to the hot tray in her hands.

84. Ms. Calderon was so scared that she immediately stopped what she was doing, ran to the bathroom and locked herself inside.

85. Once she was safely inside the bathroom, Ms. Calderon attempted to calm herself by taking deep, long breaths, but could not stop thinking about how Mr. Ariza had touched her and how humiliated she felt because of it.

86. After waiting for some time to ensure that Mr. Ariza had left for the day, Ms. Calderon left the bathroom to speak with Mr. Dezoraiev about what had happened and to ask for his support.

87. When Ms. Calderon told Mr. Dezoraiev about how Mr. Ariza groped her and how upset she was, Mr. Dezoraiev did not take her complaints seriously. Instead, he told her not to "make this an issue" and that "Ariza just wants to have sex with you" or words to that effect.

88. Mr. Dezoraiev’s cavalier response to Ms. Calderon's request for help made her feel incredibly scared and vulnerable.

89. Mr. Dezoraiev’s comment about Mr. Ariza wanting to sleep with her made her feel as though she was partially responsible for Mr. Ariza’s offensive behavior towards her.

90. Mr. Dezoraiev’s comment and his unwillingness to protect Ms. Calderon made her scared, upset and depressed.

91. From this point onward, Mr. Ariza regularly grabbed or attempted to grab Ms. Calderon’s body while making sexualized comments about her breasts or other body parts in front of other coworkers.

92. Mr. Ariza would often approach Ms. Calderon from behind and roughly grab her arms or breasts while telling other coworkers about “how large they are”–referring to Ms. Calderon's breasts–or asking her derisively when she would have sex with him.

93. Mr. Ariza also sought out Ms. Calderon when she was working alone and make unsolicited sexual advances in private.

94. Three to five times per week, Mr. Ariza would approach Ms. Calderon and say in a low voice, “veme, podemos ir a mi casa” (in English, “Look, we can go to my house”) or ask, “cuando va a tener sexo conmigo” (in English, “when are you going to have sex with me”) or words to that effect.

95. In response to Mr. Ariza’s comments made three to five times per week in a low voice, Ms. Calderon would always reply, “respetame,” (in English, “respect me”) or words to that effect, and quickly turn away from him or walk away.

96. Ms. Calderon’s repeated admonitions to respect her did not dissuade Mr. Ariza from approaching her when she was alone at work and sexually propositioning her.

97. Once, in the fall of 2018, Mr. Ariza followed Ms. Calderon into the kitchen freezer and attempted to trap her there with his body and grope her buttocks, arms, and breasts.

98. When they were in the freezer, Ms. Calderon realized that Mr. Ariza had followed her in and was attempting to trap her with his body and grope her buttocks, arms, and breasts. Ms. Calderon threw up her arms to protect herself and yelled, “Don't touch me or I'm going to scream.” She managed to escape from his grip and run back to the front of the kitchen where others were working.

99. When Ms. Calderon rejected Mr. Ariza’s advances, he would become angry and call her “gay,” and tell her, “gracias a dios estamos en este país, porque si estuvieras en mi país, te mataría” (in English, “Thank God you are in the U.S. If you were in my country, I would kill you”).

100. Mr. Ariza’s threats made Ms. Calderon very afraid.

101. Mr. Ariza regularly worked with knives in the kitchen and often came to work intoxicated.

102. Ms. Calderon feared that Mr. Ariza would stab her with a knife or otherwise hurt her.

103. Mr. Ariza’s sexual advances towards Ms. Calderon left her feeling scared, depressed and disgusted.

104. Ms. Calderon also began living in fear that one day Mr. Ariza might rape, hurt, or even kill her.

105. Ms. Calderon regularly left work in total despair, wishing that Royal Elite Palace, Ms. Hiaeve and/or Mr. Cohen would take action to make the harassment stop so that she could work in peace.

106. Once, Mr. Ariza approached Ms. Calderon, yelling, “¡quitate tu puta!” (in English, “get out, you bitch!”). Then, suddenly, Mr. Ariza grabbed a pot of boiling water from a stove and threw it at Ms. Calderon, scalding her thighs.

107. Ms. Calderon immediately reported the incident to Mr. Dezoraiev, telling him that Mr. Ariza had yelled, "¡quítate tu puta!" (in English, "get out, you bitch!") and without warning grabbed a pot of boiling water from a stove in the kitchen and thrown it at Ms. Calderon, scalding her thighs.

108. Once again, Mr. Dezoraiev refused to take any corrective action regarding Mr. Ariza. Instead, Mr. Dezoraiev directed Ms. Calderon to take the rest of the day off to recover.

109. Exasperated at Mr. Dezoraiev's refusal to provide a safe workplace and in physical pain from Mr. Ariza throwing boiling water at her which scalded her thighs, Ms. Calderon left her shift as directed and came back to work the next day.

110. On information and belief, Mr. Dezoraiev never spoke to or disciplined Mr. Ariza for yelling, "¡quítate tu puta!" (in English, "get out, you bitch!"), or for throwing boiling water at Ms. Calderon, scalding her thighs.

***The first police call.***

111. One day in fall 2017, Calderon was working silently in one area of the kitchen with her headphones in so that she could listen to music.

112. Mr. Ariza walked over to her and began gesturing at Ms. Calderon's outfit and face.

113. Ms. Calderon could not hear exactly what Mr. Ariza was saying, but it was clear that he was making derogatory comments about her appearance.

114. Mr. Ariza continued to get closer to Ms. Calderon and make loud, vulgar remarks until he was within inches of her face.

115. Standing within inches of Ms. Calderon's face, Mr. Ariza made a fist as if to hit her.

116. Terrified, Ms. Calderon ran to the bathroom and locked herself inside.

117. From inside the locked bathroom, Ms. Calderon called 911 and asked that the police be sent to Royal Elite Palace.

118. When the police arrived, Royal Elite Palace, Alexandra Hiaeve and/or Aba Cohen did not allow the police to enter the premises or to speak to Mr. Ariza.

119. Upon information and belief, one or more of the Individual Defendants or Royal Elite Palace instructed Mr. Ariza either to hide or to leave.

120. The police provided Ms. Calderon the address of the local police precinct, in case she wanted to file a formal police complaint.

121. Ms. Calderon did not file a formal complaint at that time, because she hoped that calling the police would deter Mr. Ariza from harassing her further.

122. The Individual Defendants had the authority to protect Ms. Calderon by correcting or addressing Mr. Ariza's physically threatening behavior that had necessitated calling the police.

123. On information and belief, though one or more of the Individual Defendants or Royal Elite Palace instructed Mr. Ariza to hide or leave, none of these parties took any action to protect Ms. Calderon by correcting or addressing Mr. Ariza's physically threatening behavior that had necessitated her calling the police.

***The second police call.***

124. One day a few months later, Ms. Calderon was preparing salad with a few other women coworkers while Mr. Ariza was working at a table close by.

125. Ms. Calderon and the other women were talking and laughing as they worked.

126. Mr. Ariza approached Ms. Calderon, visibly upset.

127. Mr. Ariza accused Ms. Calderon of laughing at him and without warning, reached out and grabbed Ms. Calderon's apron and shirt.

128. Mr. Ariza used the apron and shirt handhold to pull Ms. Calderon's body toward his.

129. Ms. Calderon insisted that she and the other women were not talking about him.

130. Mr. Ariza then said, “tu no eres una mujer, eres un maricon,” (in English, “you are not a woman, you are a fag”) or words to that effect.

131. One of the other women told Mr. Ariza to take his hands off of Ms. Calderon.

132. Ms. Calderon immediately left Royal Elite Palace.

133. Ms. Calderon called 911 from a laundromat nearby and asked that the police be dispatched to Royal Elite Palace.

134. Ms. Calderon remained at the laundromat until the police arrived, at which point she returned to Royal Elite Palace to report to the police what had happened to her.

135. The police asked to speak with Mr. Ariza, but upon information and belief, Mr. Dezoraiev had told Mr. Ariza to leave work before the police arrived.

136. Ms. Calderon later spoke with Mr. Dezoraiev about the incident and reported to Mr. Dezoraiev that Mr. Ariza had grabbed her and yelled obscene things at her.

137. Mr. Dezoraiev replied that it merely seemed like there was “something personal” between them or words to that effect.

138. Ms. Calderon responded that it was not something personal, that she had never done anything to invite Mr. Ariza’s behavior, and that she wanted Mr. Dezoraiev to protect her.

139. Upon information and belief, having helped Mr. Ariza avoid police interaction a second time, Mr. Dezoraiev did not take any action to address or correct Mr. Ariza’s increasingly physically aggressive bullying of Ms. Calderon.

***The third police call.***

140. On or about June 21, 2019, Ms. Calderon was operating a meat slicing machine when Mr. Ariza started taunting her, saying “te crees demasiado” (in English, “you think you are so important”) or words to that effect, and calling her names like “prostitute” (in English, “prostitute”) and describing her as “muy fea.” (in English, “very ugly”).

141. Then – suddenly – Mr. Ariza yelled, "¡qué perra!" (in English, "what a bitch!") and threw a glass bottle and a cup in Ms. Calderon's direction.

142. For the third time, Ms. Calderon called 911 and asked that the police be dispatched to her workplace, Royal Elite Palace.

143. The police arrived.

144. This time, they spoke with both Ms. Calderon and Mr. Ariza.

145. The police gave Ms. Calderon an incident information slip with the local precinct listed, the company's address, and a description of what had happened.

146. Ms. Calderon was very upset and could not stop crying.

***Mr. Dezoraiev fired Ms. Calderon for insisting that the harassment be stopped.***

147. After her shift ended, Ms. Calderon approached Mr. Dezoraiev.

148. Ms. Calderon told Mr. Dezoraiev that she could not endure the harassment any longer.

149. Ms. Calderon told Mr. Dezoraiev that Mr. Dezoraiev, Ms. Hiaeve, Mr. Cohen, and/or Royal Elite Palace must take action to stop Mr. Ariza's physical violence and verbal abuse that faced routinely in her workplace at Royal Elite Palace and protect her.

150. Ms. Calderon said that if Mr. Dezoraiev, Ms. Hiaeve, Mr. Cohen, or Royal Elite Palace failed to act then Ms. Calderon would have no choice but to file a claim against Mr. Dezoraiev and Royal Elite Palace.

151. Mr. Dezoraiev became visibly angry.

152. Mr. Dezoraiev appeared to be angry at Ms. Calderon for insisting that she, a transgender woman, be provided a safe, harassment-free, physical violence-free workplace.

153. Mr. Dezoraiev told Ms. Calderon to leave Royal Elite Palace immediately and to not return.

154. Ms. Calderon understood that she had been commanded to leave and never return to Royal Elite Palace. Ms. Calderon understood this to mean that her employment had been terminated by Mr. Dezoraiev.

***The Defendants refused Ms. Calderon's pleas for them to stop the harassment.***

155. From the beginning of 2017, when the harassment and hostile work environment started, up until Ms. Calderon's firing two and a half years later, Ms. Calderon complained to Mr. Dezoraiev on numerous occasions about the persistent harassment she endured, and that the conditions of her work had become intolerable.

156. Mr. Dezoraiev regularly witnessed or was otherwise made aware of Mr. Ariza's behavior.

157. Mr. Dezoraiev had the authority to correct, discipline, or terminate Mr. Ariza and to take action to protect Ms. Calderon from harassment.

158. Mr. Dezoraiev took no action to discipline Mr. Ariza or to protect Ms. Calderon from further harassment by Mr. Ariza.

159. Ms. Calderon spoke directly with owners or operators at Royal Elite Palace on at least two occasions.

160. On the first occasion, Ms. Calderon spoke with Defendants Mr. Cohen and Ms. Hiaeve about Mr. Ariza's relentless harassment and Mr. Dezoraiev's failure to address Mr. Ariza's relentless harassment.

161. Ms. Calderon asked Mr. Cohen and Ms. Hiaeve to take action to stop Mr. Ariza's behavior.

162. Mr. Cohen and Ms. Hiaeve had the authority to stop Mr. Ariza's behavior.

163. Mr. Cohen told Ms. Calderon that Ms. Calderon had to speak with Mr. Dezoraiev and resolve the issue with him directly.

164. Ms. Calderon replied, "Shalom [Dezoraiev] is your employee, but I am your employee too, and this is your company. You pay me my checks, not him," or words to that effect.

165. Mr. Cohen continued to insist that Ms. Calderon speak with Mr. Dezoraiev directly.

166. On the second occasion, Ms. Calderon met with Mr. Cohen, Roma (last name unknown), and "Yura," who upon information and belief was Defendant Yonayev.

167. Ms. Calderon told Mr. Cohen, Roma and Mr. Yonayev about Mr. Ariza's harassment and Mr. Dezoraiev's failure to protect her.

168. Ms. Calderon stated to Mr. Cohen, Roma and Mr. Yonayev that she "has rights like everyone else" or words to that effect.

169. Mr. Cohen, and Mr. Yorayev acknowledged that Mr. Ariza was harassing Ms. Calderon.

170. Mr. Cohen and Mr. Yorayev had the authority to stop Mr. Ariza's harassment and to protect Ms. Calderon including by commanding Mr. Dezoraiev to protect her.

171. Mr. Cohen, and/or Mr. Yorayev said to Ms. Calderon that "there is nothing we can do to stop" Mr. Ariza's harassment of Ms. Calderon, or words to that effect.

172. Upon information and belief, neither Royal Elite Palace nor any of the Individual Defendants investigated, made a report of, or otherwise took action regarding the complaints Ms. Calderon made to them.

173. Royal Elite Palace and the Individual Defendants did not have an anti-harassment policy.

174. Royal Elite Palace and the Individual Defendants never provided Ms. Calderon with information on how to formally make a complaint or report other instances of harassment in the workplace.

175. Royal Elite Palace failed to provide training to its employees as required by law regarding gender-based harassment.

176. Royal Elite Palace and the Individual Defendants never provided Ms. Calderon an employee handbook or any written policies as to formally make a complaint or report other instances of harassment in the workplace

177. Ms. Calderon took advantage of every corrective opportunity possible.

178. Royal Elite Palace and the Individual Defendants did not correct the harassing behavior.

***Ms. Calderon suffered emotional and dignitary injuries.***

179. Ms. Calderon suffered significant emotional distress and other dignitary harm as a result of being verbally, physically, and sexually harassed for two and a half years.

180. Ms. Calderon suffered significant monetary damages, emotional distress, and dignitary harm as the result of being wrongfully terminated from her employment in retaliation for asking for protections to which she is entitled under federal, state, and local laws.

181. Immediately after her termination on or around June 21, 2019, Calderon fell into a deep depression. For weeks beginning on or around June 21, 2019, Ms. Calderon was unable to leave her house, and on some days could not even get out of bed.

182. During the weeks of depression that Ms. Calderon experienced beginning on or around her termination on June 21, 2019, Ms. Calderon found it extremely difficult to find new employment or even carry out day-to-day household tasks.

183. Ms. Calderon sought therapy to help her cope with her ongoing emotional distress.

184. Ms. Calderon continues to suffer extreme emotional distress as a result of the verbal and physical harassment she suffered as an employee at Royal Elite Palace.

**Facts – FLSA and NYLL Claims**

185. Plaintiff Calderon was employed by Defendants at Royal Elite Palace (formally known as Elite Palace) between the summer of 2013 through on or around June 21, 2019.

186. Up until the beginning of 2019, Ms. Calderon worked six (6) days per week, around ten (10) to twelve (12) hours a day, for a total of as many as seventy (70) hours per week.

187. For approximately the last six (6) months of her employment, Ms. Calderon's hours were reduced, and she began working six (6) days per week, around eight (8) to ten (10) hours a day, or around forty-five (45) to fifty-five (55) hours per week.

188. When Ms. Calderon started working for Defendants in 2013, she was paid a flat rate of one hundred ($100) per day. At the beginning of 2015, her rate increased to one hundred twenty ($120) per day. Her rate increased again at the beginning of 2018 to one hundred fifty ($150) per day.

189. Although Ms. Calderon consistently worked more than forty (40) hours each week, Defendants never paid her overtime compensation at a rate of at least one-and-one-half times her regularly hourly rate, as is legally required.

190. Instead, Ms. Calderon was paid a flat daily rate for all of the hours she worked for Defendants and there was never a written agreement written or oral between the parties as to that flat rate encompassed the overtime premium under the Law.

191. Up until the beginning of 2019, the interval between the beginning and the end of Plaintiff's workday exceeded ten (10) hours. However, Ms. Calderon was never paid an additional hour at the minimum wage on the days in which her spread of hours exceeded ten (10) hours, as required by the Hospitality Industry Wage Order promulgated by the New York State Commissioner of Labor, 12 New York Codes, Rules, and Regulations ("N.Y.C.R.R.") § 146-1.6.

192. Defendants paid Ms. Calderon all of her wages in cash up until in or around March 2019, when Ms. Calderon requested that Defendants pay her in check, so that she could properly report her income for tax purposes. At the point, Defendants began paying Ms. Calderon a flat rate of six

hundred ($600) per week in check, and a flat rate three hundred ($300) per week in cash, regardless the number of hours Ms. Calderon worked each week.

193. When Ms. Calderon asked if all of her wages could be paid in check with a corresponding wage statement or paystub, Defendant Hiaeve, willfully seeking to avoid proper payment of wages pursuant to federal and state labor law, told Ms. Calderon that Defendants would only be willing to pay her a portion of her wages in check, and that they would pay the rest in cash in order "to avoid paying business taxes," or words to that effect.

194. At the time Ms. Calderon began working for Defendants, Defendants willfully failed to furnish to her written notice of her wage rate, or a written disclosure of the other information required by NYLL § 195(1) in her primary language.

195. Defendants willfully failed and refused to furnish to Ms. Calderon written notice or a disclosure of the information required by NYLL § 195(1), including notice of any changes to her rate of pay.

196. In addition, Defendants willfully failed to furnish proper and accurate wage statements to Ms. Calderon as is required by NYLL § 195(3). During the last month or two of Ms. Calderon's employment, Defendants provided her wage statements that incorrectly stated the amount of wages earned and incorrectly classified her as a salaried employee with a flat rate of six hundred ($600) per week.

197. At all times relevant to this action, Defendants failed to post, in a visible and accessible location, the required posters informing employees of their rights under the FLSA and under NYLL. As a result, the FLSA and NYLL statute of limitations should be equitably tolled to allow Ms. Calderon to recover for legal violations during her entire period of employment.

198. On November 27, 2019, Ms. Calderon filed a claim for unpaid wages with the NYSDOL.

199. On December 30, 2019, the NYSDOL issued to Ms. Calderon a Notice of Complaint Received.

200. Ms. Calderon's claims under NYLL are thereby tolled from the date of filing with the NYSDOL pursuant to NYLL § 198(3).

***Defendants Alexandra Hiaeve, Aba Cohen, Roben Katanov, and Yuri Yonayev had had active, operational control over all aspects of Royal Elite Palace***

201. Individual Defendants, Alexandra Hiaeve, Aba Cohen, Roben Katanov, and Yuri Yonayev had the power to establish, and did establish – directly and/or through their agent(s) – the terms of Plaintiff Calderon's employment.

202. Each of these Individual Defendants, directly or indirectly, determined the salary to be paid to Ms. Calderon.

203. Each of these Individual Defendants had the power to hire and fire employees of Royal Elite Palace (formerly Elite Palace), and they exercised that power, whether directly or through their agent(s).

204. Each of these Individual Defendants worked at Royal Elite Palace on a daily basis.

205. Each of these Individual Defendants had the power to control the day-to-day functions of Royal Elite Palace, and did control, the day-to-day operations of Royal Elite Palace.

206. Each of these Individual Defendants, directly or indirectly, managed, supervised, and directed the business and operations of Royal Elite Palace.

***Successors: Elite Palace and Royal Elite Palace***

207. Corporate defendants were and are owned, operated, and controlled by the same owner, or owner group, operating as a unified operation and, upon information and belief, each provide

mutually supportive services to the substantial advantage of the other such that each entity is operationally interdependent of each other and, therefore, may be treated as a single enterprise.

208. Upon information and belief, Elite Palace was involved in the business and operations of Royal Elite Palace (formerly Elite Palace) as early as May 2007 until approximately July 3, 2014.

209. Upon information and belief, Defendant Royal Elite Palace Caterers LLC was involved in the business and operations of Royal Elite Palace starting from approximately July 3, 2014 to on or about December 7, 2020.

210. Upon information and belief, as joint successors, Defendant Royal Elite Palace Caterers acquired and continued, without interruption or substantial change, the business operations of Elite Palace LLC, and is liable for the debts and liabilities of their predecessor.

211. The performance of Ms. Calderon's job responsibilities, as well as the responsibilities of other similarly situated employees, was at all relevant times controlled by one person or group of persons, corporations, or other organizational units acting together.

212. Upon information and belief, the individual Defendants Alexandra Hiaeve, Aba Cohen, Roben Katanov, and Yuri Yonayev; and corporate Defendant Royal Elite Palace Caterers LLC, located at and operating at 69-02 Garfield Avenue, Woodside, New York 11377, all shared control of Ms. Calderon.

***Further Allegations***

213. During the course of her employment, Plaintiff Calderon handled, sold, or otherwise worked on items that were produced for movement in interstate commerce.

214. At all times relevant to this action, Defendants employed two or more individuals, including Ms. Calderon, handling, selling, or otherwise working on goods or materials that have been moved in or produced for commerce.

215. Defendants undertook all of the actions and omissions alleged above either directly, or through their agents who were authorized to undertake such actions and omissions.

216. The actions and omissions alleged hereinabove were willful.

**COUNT 1**
**42 U.S.C. §§ 2000e-2(a)(1) and 2000e-3**
**Sex Discrimination and Retaliation**
**(Against Royal Elite Palace Caterers LLC)**

217. Plaintiff incorporates by reference each foregoing paragraph as if fully stated herein.

218. Under Title VII, it is unlawful for an employer to "to discharge . . . or otherwise discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1).

219. Based upon observations of the workplace, Defendant Royal Elite Palace Caterers LLC had fifteen or more employees at the time of the acts alleged herein.

220. Defendant Royal Elite Palace Caterers LLC engaged in unlawful employment practices prohibited by § 2000e by discriminating against Plaintiff because of her sex as a motivating factor or but for her sex, and by creating a hostile work environment based on sex.

221. Further, Under Title VII, it is unlawful for an employer to "discriminate against any . . . employee[] . . . because [s]he has opposed any practice made an unlawful employment practice by this subchapter, or because [s]he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3.

222. Defendant Royal Elite Palace Caterers LLC engaged in unlawful employment practices prohibited by § 2000e-3 by retaliating against Plaintiff for complaining and demanding remedy of the aforementioned violations.

223. As a result of the acts and conduct complained of herein, Plaintiff suffered and will continue to suffer damages including but not limited to economic and pecuniary losses (past and

future) – such as income and any other compensation that she was denied because of her sex; severe emotional distress, psychological and physical stress, pain; loss of enjoyment of life; and other non-pecuniary losses and special damages.

**COUNT 2**
**N.Y. Exec. Law § 296(1)(a)**
**Discrimination and Retaliation**
**(Against Royal Elite Palace Caterers LLC and the Individual Defendants)**

224. Plaintiff incorporates by reference each foregoing paragraph as if fully stated herein.

225. It is "an unlawful discriminatory practice" for an employer, based on an individual's gender or sex, "to discharge from employment . . . or to discriminate against such individual in compensation or in terms, conditions or privileges of employment." N.Y. Exec. Law § 296(1)(a).

226. Further, under NYSHRL, it is unlawful for "any person engaged in any activity to which this section applies to retaliate or discriminate against any person because he or she has opposed any practice forbidden under this article or because he or she has filed a complaint, testified or assisted in any proceeding under this article."

227. Defendants engaged in an unlawful discriminatory practice by discriminating against Plaintiff because of her sex and/or gender identity, by retaliating against her for her opposition to practices forbidden under NYSHRL and by creating a hostile work environment based on sex and/or gender identity and/or retaliation.

228. As a result of the acts and conduct complained of herein, Plaintiff suffered and will continue to suffer damages including but not limited to economic and pecuniary losses (past and future) – such as income and any other compensation that she was denied because of her sex; severe emotional, psychological and physical stress, distress, anxiety, pain and suffering; the inability to enjoy life's pleasures; and other non-pecuniary losses and special damages.

229. Accordingly, as a result of Defendants' unlawful conduct, Plaintiff has been damaged as set forth herein and is entitled to the maximum compensation available under this law.

**COUNT 3**
**N.Y.C. Admin. Code § 8-107(1)**
**Discrimination and Retaliation**
**(Against Royal Elite Palace Caterers LLC and the Individual Defendants)**

230. Plaintiff incorporates by reference each foregoing paragraph as if fully stated herein.

231. It is "an unlawful discriminatory practice: (a) For an employer or an employee or agent thereof, because of the actual or perceived . . . gender, [or] sexual orientation . . . of any person, to . . . discharge from employment . . . or to discriminate against such person in compensation or in terms, conditions or privileges of employment." New York City Administrative Code §8-107(1).

232. Defendants engaged in an unlawful discriminatory and retaliatory practices in violation of § 8-107(1) by creating and maintaining discriminatory working conditions, and otherwise discriminating and retaliating against Plaintiff because of her sex, because she demanded a cessation of the discrimination she suffered and because of a hostile work environment based on sex and retaliation.

233. As a result of the acts and conduct complained of herein, Plaintiff suffered and will continue to suffer damages including but not limited to economic and pecuniary losses (past and future) – such as income and any other compensation that she was denied because of her sex; severe emotional distress, physical pain; loss of enjoyment of of life; and other non-pecuniary losses.

**COUNT 4**
**N.Y. Exec. Law § 296(6)**
**Aiding and Abetting**
**(Against the Individual Defendants)**

234. Plaintiff incorporates by reference each foregoing paragraph as if fully stated herein.

235. New York State Executive Law § 296(6) provides that it shall be an unlawful discriminatory practice: "For any person to aid, abet, incite compel or coerce the doing of any acts forbidden under this article, or attempt to do so."

236. Individual Defendants engaged in an unlawful discriminatory practice in violation of § 296(6) by aiding, abetting and inciting the discriminatory and retaliatory conduct of Mr. Ariza and Mr. Dezoraiev against Plaintiff.

237. As a result of the acts and conduct complained of herein, Plaintiff suffered and will continue to suffer damages including but not limited to economic and pecuniary losses (past and future) – such as income and any other compensation that she was denied because of her sex; severe emotional distress, physical pain; loss of enjoyment of life; and other non-pecuniary losses

.

238. Accordingly, as a result of individual Defendants' unlawful conduct, Plaintiff has been damaged as set forth herein and is entitled to the maximum compensation available under this law.

**COUNT 5**
**N.Y.C. Admin. Code § 8-107(6)**
**Aiding and Abetting**
**(Against the Individual Defendants)**

239. Plaintiff incorporates by reference each foregoing paragraph as if fully stated herein.

240. The New York City Administrative Code § 8-107(6) provides that it shall be unlawful discriminatory practice: "For any person to aid, abet, incite, compel; or coerce the doing of any of the acts forbidden under this chapter, or attempt to do so."

241. Individual Defendants engaged in an unlawful discriminatory practice in violation of New York City Administrative Code § 8-107(6) by aiding and abetting the above discriminatory, unlawful and retaliatory conduct.

242. As a result of the acts and conduct complained of herein, Plaintiff suffered and will continue to suffer damages including but not limited to economic and pecuniary losses (past and future) – such as income and any other compensation that she was denied because of her sex; emotional distress, physical pain; loss of enjoyment of life; and other non-pecuniary losses and special damages.

243. Accordingly, as a result of individual Defendants' unlawful conduct, Plaintiff has been damaged as set forth herein and is entitled to the maximum compensation available under this law.

**COUNT 6**
**Negligence Per Se**
**Violation of New York Labor Law § 201-G(1)(b)**
**(Against Royal Elite Palace Caterers LLC)**

244. Plaintiff incorporates by reference each foregoing paragraph as if fully stated herein.

245. Under New York Labor Law § 201-G(1)(b), every employer in New York State must adopt a model sexual harassment prevention policy provided by the New York State Department of Labor or establish a sexual harassment prevention policy to prevent sexual harassment that equals or exceeds the minimum standards in the model policy.

246. Further, the policy must be given to each employee in writing and, under § 201-G(2)(a), there must be an interactive training program that includes: (i) an explanation of sexual harassment consistent with guidance issued by the New York State Department of Labor; (ii) examples of sexual harassment; (iii) information on federal and state law on sexual harassment and remedies; and (iv) information on employees' rights of redress and all potential *fora* for adjudicating complaints.

247. As an employee of Royal Elite Palace, Ms. Calderon was among the class of people protected from sexual harassment by the required promulgation of a sexual harassment policy

designed to stop sexual harassment and provision of that policy in writing and an interactive sexual harassment prevention training to employees.

248. New York Labor Law § 201-G(1)(b) and § 201-G(2)(a) establish the standard of conduct for providing the policy and training using the word, "shall."

249. Defendant knew or reasonably should have known that failure to provide the required policy and training would cause foreseeable harm, damage, and/or personal injuries to employees including Ms. Calderon by the failure to take statutorily required action designed to stop sexual harassment in the workplace.

250. Defendant failed to adopt a sexual harassment policy.

251. Defendant failed to provide each employee a written copy of a sexual harassment policy.

252. Defendant failed to provide its employees an interactive training for the prevention of sexual harassment.

253. By violating § 201-G(1)(b) and § 201-G(2)(a), Defendant was negligent *per se* under the common law of the State of New York.

254. As a direct and proximate result of Defendant's acts or omissions, Ms. Calderon was harmed and has suffered damages as described herein.

**COUNT 7**
**Negligence Per Se**
**Violation of New York City Code Section 8-107(29)**
**(Against Royal Elite Palace Caterers LLC)**

255. Plaintiff incorporates by reference each foregoing paragraph as if fully stated herein.

256. Under New York City Code § 8-107(29), Defendant Royal Palace Elite LLC owed a statutory duty to employees including Ms. Calderon to display the Stop Sexual Harassment Act Notice in both English, www1.nyc.gov/assets/cchr/downloads/pdf/materials/SexHarass_Notice-8.5x14.pdf, and Spanish,

www1.nyc.gov/assets/cchr/downloads/pdf/materials/SexHarass_Notice8.5x14_spa-US_FINALVERSION.pdf, and to distribute the Stop Sexual Harassment in NYC Act Fact Sheet, www1.nyc.gov/site/cchr/media/sexual-harassment-act-factsheet.page, to each individual employee at the time of hire.

257. The notice and fact sheet protect employees from sexual harassment by announcing that New York City Human Rights Law bans sexual harassment and defines it as gender-based discrimination, and by giving examples of sexual harassment, explaining how to report sexual harassment to the City Commission on Human Rights or State Division on Human Rights, and by stating that employers are prohibited from retaliating against employees for speaking against or reporting sexual harassment in the workplace.

258. As an employee of Royal Elite Palace, Ms. Calderon was within the class of persons protected from sexual harassment by the required provision of the notice and fact sheet.

259. Section 8-107(29) establishes the standard of conduct for the provision of the materials as "must."

260. Defendant knew or reasonably should have known that failure to provide the required notice and fact sheet containing information on identifying, preventing and stopping sexual harassment would cause foreseeable harm, damage, and/or personal injuries to employees including Ms. Calderon by the failure to take statutorily required action that was designed to stop sexual harassment in the workplace.

261. Defendant failed to post the Stop Sexual Harassment Act Notice.

262. Defendant failed to provide the Stop Sexual Harassment in NYC Act Fact Sheet to Ms. Calderon.

263. Upon information and belief, Defendant failed to provide the Stop Sexual Harassment in NYC Act Fact Sheet to any employee.

264. By violating § 8-107(29), Defendant was negligent *per se* under the common law of the State of New York.

265. As a direct and proximate result of corporate Defendant's acts or omissions, Ms. Calderon was harmed and has suffered damages as described herein.

**COUNT 8**
**Negligence Per Se**
**Violation of New York City Code Section 8-107(30)**
**(Against Royal Elite Palace Caterers LLC)**

266. Plaintiff incorporates by reference each foregoing paragraph as if fully stated herein.

267. Under New York City Code § 8-107(30), Defendant Royal Palace Elite LLC owed a statutory duty to its employees, including Ms. Calderon, to conduct an annual sexual harassment prevention training for all employees.

268. Section 8-107(30) requires that employers ensure all employees are trained annually, beginning with Calendar Year 2019, and every year thereafter.

269. Section 8-107(30) requires employers to use a training program provided at www1.nyc.gov/site/cchr/law/sexual-harassment-training.page. Alternatively, employers may provide their own training if it includes the same elements as the provided program: (1) an explanation of sexual harassment as a form of unlawful discrimination under local law; (2) a statement that sexual harassment is also a form of unlawful discrimination under state and federal law; (3) a description of what sexual harassment is, using examples; (4) any internal complaint process available to employees through their employer to address sexual harassment claims; (5) the complaint process available through the Commission, the New York State Division of Human Rights and the United States Equal Employment Opportunity Commission, including contact

information; (6) the prohibition of retaliation including examples; (7) information concerning bystander intervention, including but not limited to any resources that explain how to engage in bystander intervention; and (8) the specific responsibilities of supervisory and managerial employees in the prevention of sexual harassment and retaliation, and measures that such employees may take to appropriately address sexual harassment complaints.

270. Section 8-107(30) also requires that employers keep a record of all trainings, including a signed employee acknowledgement, whether on paper or in electronic form.

271. Section 8-107(30) establishes the standard of conduct for the provision of the sexual harassment training and keeping of the records using the words, "shall" and "required."

272. Defendant knew or reasonably should have known that failure to provide the required sexual harassment training and keep records proving its provision would cause foreseeable harm, damage, and/or personal injuries to employees including Ms. Calderon by the failure to take statutorily required action designed to stop sexual harassment in the workplace.

273. Defendant failed to provide an annual sexual harassment prevention training to its employees following either the provided program or a program of its own design fulfilling the required elements.

274. Defendant failed to keep records of any sexual harassment training, including signed employee acknowledgements.

275. By violating § 8-107(30), Defendant was negligent *per se* under the common law of the State of New York.

276. As a direct and proximate result of corporate Defendant's acts or omissions, Ms. Calderon was harmed and has suffered damages as described herein.

**COUNT 9**
**Overtime Wages Violations**
**(Fair Labor Standards Act)**

277. Plaintiff incorporates by reference each foregoing paragraph as if fully stated herein.

278. Defendants willfully failed to pay Ms. Calderon overtime at a rate of at least one-and-one-half times her regular hourly rate for every hour she worked above forty (40) hours in a work week. This failure violates the Fair Labor Standards Act, 29 U.S.C. § 207(a) and its implementing regulations.

279. Defendants also violated the FLSA by failing to keep records as required by statute, 29 U.S.C. § 211(c).

280. Ms. Calderon is entitled to her unpaid wages, plus an additional equal amount in liquidated damages, as a consequence of Defendants' unlawful actions and omissions, in accordance with 29 U.S.C. § 216(b).

281. Ms. Calderon is also entitled to costs of Court, pursuant to 29 U.S.C. § 216(b).

282. Ms. Calderon seeks, and is entitled to, attorneys' fees incurred by her counsel, pursuant to 29 U.S.C. § 216(b).

**COUNT 11**
**Overtime Wages Violations**
**(New York Labor Law)**

283. Plaintiff incorporates by reference each foregoing paragraph as if fully stated herein.

284. Defendants willfully failed to pay Ms. Calderon overtime at a rate of at least one-and-a-half times her regularly hourly rate for every hour she worked above forty (40) hours in a single work week

285. Defendants' failure to pay the required wages as set forth above was willful within the meaning of New York Labor Law §§ 198, 663, and 681.

286. Ms. Calderon is entitled to her unpaid wages mandated by New York Labor Law, plus an additional 100 percent as liquidated damages, as a consequence of the Defendants' unlawful actions and omissions in accordance with New York Labor Law §§ 198, 663, and 681.

287. Ms. Calderon seeks, and is entitled to, attorneys' fees incurred by her counsel, costs of Court, and interest.

**COUNT 12**
**Spread of Hours Pay Violations**
**(New York Labor Law)**

288. Plaintiff incorporates by reference each foregoing paragraph as if fully stated herein.

289. Ms. Calderon regularly worked days in which the end of her work shift was more than ten (10) hours from the beginning to the end of her work shift.

290. Defendants, in violation of 12 N.Y.C.R.R. § 146-1.6, never paid Ms. Calderon an additional hour of pay at the minimum wage rate for every day in which the interval between the beginning and the end of Ms. Calderon's workday was more than ten (10) hours.

291. Ms. Calderon is entitled to her unpaid spread of hour pay as mandated by New York Labor Law, plus an additional 100 percent as liquidated damages, as a consequence of the Defendants' unlawful actions and omissions, in accordance with New York Labor Law §§ 198, 663, and 681.

292. Ms. Calderon seeks, and is entitled to, attorneys' fees incurred by her counsel, costs of Court, and interest.

**COUNT 13**

**Wage Notice and Wage Statement Violations**
**(New York Labor Law)**

293. Plaintiff incorporates by reference each foregoing paragraph as if fully stated herein.

294. Defendants failed to provide Ms. Calderon, at the time of her hiring or thereafter, wage notices in her primary language containing her rates of pay and other information as required by New York Labor Law § 195(1).

295. Defendants failed to provide Ms. Calderon with accurate wage statements, with every payment of wages, which provided all of the information required under New York Labor Law § 195(3).

296. For Defendants' violation of New York Labor Law § 195(1), Ms. Calderon is entitled to $50 for each workday in which this violation continued to occur, in an amount not to exceed $5,000, pursuant to New York Labor Law §198(1-b).

297. For Defendants' violation of New York Labor Law § 195(3), Ms. Calderon is entitled to $250 for each workday in which this violation continued to occur, in an amount not to exceed $5,000, pursuant to New York Labor Law §198(1-d).

298. Ms. Calderon also seeks, and is entitled to, attorneys' fees incurred by her counsel, costs of Court, and interest.

## Jury Demand

299. Plaintiff requests a jury trial on all issues to be tried.

**WHEREFORE**, Plaintiff respectfully requests a judgment against Defendants:

A. Declaring that Defendants engaged in unlawful employment practices prohibited by Title VII, the NYSHRL, and the NYCHRL, in that Defendants discriminated against Plaintiff on the basis of her sex and/or gender, as well as unlawful employment practices prohibited by the FLSA and NYLL;

B. Granting judgment to Plaintiff on her FLSA claims and awarding Plaintiff her unpaid wages and an equal amount in liquidated damages;

C. Granting judgment to Plaintiff on her NYLL claims and awarding Plaintiff her unpaid wages, spread of hours compensation, applicable statutory damages, and liquidated damages as provided for by statute;

D. Awarding damages to Plaintiff for all lost wages and benefits resulting from Defendants' unlawful discrimination and to otherwise make her whole for any losses suffered as a result of such unlawful employment practices;

E. Awarding Plaintiff compensatory damages for mental and emotional injury, distress, pain and suffering and injury to her reputation in an amount to be proven;

F. Awarding Plaintiff punitive damages;

G. Awarding Plaintiff prejudgment and post judgment interest as allowed by law;

H. Awarding Plaintiff attorneys' fees, costs, disbursements, and expenses incurred in the prosecution of the action;

I. Enjoining Defendants to revise their employment practices and procedures to educate all employees on transgender people and the issues they face, best practices for what is and is not acceptable to say or ask in response to discovering a person is transgender, and forbidding any behavior that targets or shames a person on the basis of sex or gender expression.

J. Awarding Plaintiff such other and further relief as the Court may deem equitable, just and proper to remedy the Defendants' unlawful employment practices.

DATED: New York, New York
August 8, 2022

Respectfully Submitted,

**Alicia Calderon**

/s *Jillian T. Weiss*
Jillian T. Weiss
LAW OFFICE OF JILLIAN T. WEISS, P.C.
226 Prospect Park W, No. 104
Brooklyn, NY 11215
Tel: (845) 709-3237
Fax: (845) 684-0160
Email: jweiss@jtweisslaw.com

*/s Jose Cristobal Gutierrez*
Jose Cristobal Gutierrez
92-10 Roosevelt Ave
Jackson Heights, NY 11372
(646) 801-6627
Cristobal.Gutierrez@MaketheRoadNY.org

*Attorneys for the Plaintiff*