UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------X

ALICIA CALDERON, : 21-CV-6367 (EK)(MMH)

Plaintiff, : November 28, 2023

v. : Brooklyn, New York

ROYAL ELITE PALACE CATERERS, LLC, et al.,

Defendant.

------------------------------X

TRANSCRIPT OF CIVIL CAUSE FOR CHEEKS HEARING
BEFORE THE HONORABLE MARCIA M. HENRY
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the Plaintiff: JOSE GUTIERREZ, ESQ.
CORINNA SVARLIEN, ESQ.
Make the Road NY
92-10 Roosevelt Ave
Jackson Heights, NY 11372

For the Defendant: ADAM SHERMAN, ESQ.
Jacobs PC
595 Madison Avenue, 39th Floor
New York, NY 10022

EMANUEL KATAEV, ESQ.
Milman Labuda Law Group PLLC
3000 Marcus Avenue, Suite 3W8
Lake Success, NY 11042

Court Transcriber: ARIA SERVICES, INC.
c/o Elizabeth Barron
274 Hovey Road
Milo, ME 04463
Aria@leinen.net

Proceedings recorded by electronic sound recording, transcript produced by transcription service

THE CLERK: Civil cause for video Cheeks motion hearing for case number 21-CV-6367, Calderon, et al. v. Royal Elite Palace Caterers, LLC, et al. As a reminder, pursuant to Local Civil Rule 1.8, the parties may not independently record any court proceedings. A transcript of this proceeding may be ordered from the clerk's office.

That being said, counsel for plaintiff, please unmute and state your appearances for the record.

MR. GUTIERREZ: This is Jose Gutierrez for plaintiff Calderon.

MS. SVARLIEN: Good morning. This is Corinna Svarlien for plaintiff Calderon.

MS. WEISS: Good morning. This is Jillian Weiss for plaintiff Calderon.

THE COURT: Good morning.

THE CLERK: Counsel for the Royal Elite defendants, please unmute and please state your appearance.

MR. SHERMAN: Good morning, your Honor. Adam Sherman from Jacobs PC for the Royal Elite defendants.

THE COURT: Good morning.

THE CLERK: And for the remaining individual

defendants in this case, counsel please state your appearance.

MR. KATAEV: Good morning. Emanuel Kataev from Milman Labuda Law Group PLLC for the former owner defendants.

THE COURT: Good morning. Is that everyone?

THE CLERK: That's everyone.

THE COURT: All right. Then we are here for a hearing on the parties' joint motion for settlement approval. This motion was filed on May 3rd of 2023 and the operative motion is document 78 on the docket. The parties consented to magistrate judge disposition of this motion, so today's proceeding is for the purpose of hearing some argument and answers to the Court's questions and then determining the motion or if there needs to be any followup before a decision can be rendered.

Before I do that, let me just clarify the documents that I've reviewed in advance of the motion papers themselves. First, there's the first amended complaint at document 56 on the docket, which was filed on September 19th, 2022, the answer to the first amended complaint, which was filed -- excuse me -- which was filed on October 7th, 2022, and there's also the actual motion papers, which again is document 78. I think

there was a different version of the motion papers filed the same day but ultimately, that was negated and we're just dealing with document 78.

That consists of the letter motion, which is document 78, its exhibits. Document 78-1 is the proposed settlement agreement that is fully executed and that is in English. Exhibit 2, which is document 78-2, is the same settlement agreement in Spanish. And document 78-3 is Exhibit 3, which is a spreadsheet of unpaid wages.

In addition, there's also document 79. Document 79 is the confidential agreement that governs the non-wage-and-hour claims in this case. That was also filed on May 3rd of 2023. It is a sealed document so I will not get into the particulars unless necessary for the purposes of this conversation. But I will note that it includes multiple exhibits as well as an executed agreement.

Any other documents that I need to have reviewed or examined in order to move forward with deciding the motion for settlement approval? Who will be speaking for plaintiff?

MR. GUTIERREZ: I will, your Honor.

THE COURT: It's Mr. Gutierrez?

MR. GUTIERREZ: I believe that's all the

documents that need to be reviewed today.

THE COURT: Okay. Mr. Gutierrez, if you're going to be the lead spokesperson, I need you to get as close to that mic as you can without shoving your face into the camera. There's a little bit of a sound echo there. Thank you, Mr. Gutierrez.

Mr. Sherman?

MR. SHERMAN: Yes, your Honor.

THE COURT: Okay. I have all documents needed?

MR. SHERMAN: Yes.

THE COURT: Okay. And, Mr. Kataev?

MR. KATAEV: I'm not aware of any other documents, your Honor.

THE COURT: Okay, all right, fine. The proposed settlement -- we'll call it the FLSA settlement agreement -- provides for a settlement in the amount of $17,302.83 for the plaintiff. It also provides for waiver of the attorneys' fees and costs that have been incurred in litigating the FLSA action.

The parties have correctly provided an analysis of the factors set forth in Walinsky (ph) relating to the review of the statement agreement, and I want to start with -- I want to start with the provisions of the agreement as well as the first

factor, which is the plaintiff's range of recovery.

Mr. Kataev, can you just mute your line because I think there's some background noise there. And if anyone is not speaking, please mute yourselves. Thank you.

The estimated unpaid wages, the total range of recovery of plaintiff's damages if this case were to be fully litigated is an amount of $137,937.77. I will say that when I did the calculations based on some of the information in the damages spreadsheet, I came up with a slightly lower number. It was 137,636. But I don't think -- if that were just it, I wouldn't -- I don't believe that that's a problem. It may just be a rounding situation in that case.

But my calculations show that using the number -- plaintiff's number, that the plaintiff would recover approximately 12.54% or the settlement permits the plaintiff to recover that amount. When I use my number, I think it ends up being a similar percentage, 12.5%. I would note, however -- well, let me get to this later.

Did you want to be heard on the plaintiff's range of recovery and why this particular percentage is sufficient?

MR. KATAEV: I do, but I'm not sure if

you're referring to me, your Honor.

THE COURT: I'm referring to anyone who would like to be heard.

MR. KATAEV: I'll take the lead. Your Honor, this number is beyond inflated. We provided records that show that she did not work this many hours, and as noted --

THE COURT: Hang on, hang on. That's getting to another factor, which is the litigation risk. And at that point, I'm happy to hear from counsel for both sets of defendants as to why they believe there are many different reasons why the plaintiff should not recover anything. So, Mr. Kataev, I'm going to hold on that and go back to Mr. Gutierrez to talk about this range of recovery being reasonable.

MR. GUTIERREZ: Sure, your Honor. Is that better or is there still a little --

THE COURT: Much, much better.

MR. GUTIERREZ: As your Honor pointed, we estimated the percentage of recovery to be 12.54. Your Honor has accepted recovery rates of around that range. I am looking at Lee v. HLY Chinese Cuisine, which was a recovery of 13.8. We are -- we think that needless to say, it is on the lower range but plaintiff is also receiving another amount for the (ui) which leaves us -

- leaves us very content in that sense.

THE COURT: Okay. Well, yes, you did cite Lee and yes, thank you for providing it in the chat. I am well-familiar with that decision and notably, consistent with that decision, this appears to be a defendant that is in the hospitality business that was severely impacted by the pandemic and that this type of recovery from this type of defendant is deemed to be something that is reasonable in context. So that does support a finding of reasonableness. The second factor is the extent to which the settlement will enable the parties to avoid the burdens and expenses of establishing their respective positions in this case, which also dovetails with the third factor, the seriousness of the litigation risks.

So now, Mr. Kataev, if you would like to explain all of the reasons why you believe the defense would be victorious in this litigation, I'm happy to hear from you.

MR. KATAEV: Sure. Just to piggy-back off the earlier discussion, we did provide case law that said, you know, approximately 12% is sufficient, as noted by my esteemed colleague on the other side. The Lee case is applicable. The catering hall did in fact shut down and stop operating. They surrendered their

lease. It gave up everything in there. They were unable to continue operating due to the Covid pandemic.

And then on top of that, the actual numbers that form the basis for the $137,000 was largely inflated based on the estimations of the hours that this plaintiff claims she worked. She didn't work these hours and the records we provided in discovery showed that she worked less hours than she claims. So for all of those reasons, you know, when evaluating the range of reasonable recovery, that $137,000 number should really be taken with a grain of salt. The percentage of recovery is actually a lot greater when factoring in the records.

THE COURT: Thank you, Mr. Kataev.

Mr. Sherman, did you want to add anything to that?

MR. SHERMAN: I'll only add that, you know, this number was reached after, you know, a lengthy mediation between the parties. And, you know, I think all sides would agree that this number based on the case law is reasonable.

THE COURT: Okay, thank you, Mr. Sherman.

I think that both Mr. Kataev's and Mr. Sherman's comments support -- support a finding that those two factors of litigation risk and anticipated

burdens of further litigation support this settlement as being reasonable. Mr. Sherman also alluded to an important fact related to the next factor, which is the arm's-length bargaining between experienced counsel. And yes, there was a mediated resolution to this case, which certainly supports a finding of reasonableness. I have been -- I have been the assigned magistrate judge for this case since its inception and I'm familiar with counsel from other cases. I'm well aware of your extensive experience with these sorts of cases as well.

There is no circumstance here that suggests that the fifth factor is at play here, which is the existence of any sort of fraud or collusion. As I understand it, Ms. Calderon no longer works for the defendants, which supports a finding that there is no collusive effect here. Therefore, that factor also supports a finding of reasonableness.

What I'd like to do now is turn to the specific FLSA agreement and talk about the terms because I have a few questions there. I first want to start -- if you have the document in front of you, I'm going to be referencing page numbers and paragraphs, and it's specific to the ECF pagination, so document 78-1.

Let's start with page 2, paragraph 2, which is the consideration paragraph. (Ui) while I get to page 2.

MR. KATAEV: Is that paragraph 2(c), your Honor?

THE COURT: No, 2(b). It's document 78-1 and it is paragraph 2(b). I'm talking about the actual settlement agreement. I guess the consideration -- the title of it starts on page 1 but we're talking about paragraph 2(b). It's sort of the tail end of the first long sentence here and it states -- in sum and substance, it states that the plaintiff won't seek any further compensation relating generally to wage-and-hour concerns. And then it says, "or any aspect of Calderon's relationship with the defendant." That to me is broader than the FLSA or an FLSA agreement.

So I would like to understand how this is permissible under a host of cases, some of which I can cite for you, that speak to these sorts of over-broad provisions as being impermissible in FLSA settlement agreements. I know you have another settlement agreement. We'll get to that in a second but as to this particular agreement --

MR. KATAEV: I'll take the lead on that, your Honor. The case law in the Eastern District and

the Southern District is that if the employment relationship is over, as it is here, and both parties provide each other a general release, which I believe is the case here, if not in this agreement then I believe in the other agreement, then mutual general releases are permitted. To the extent that this particular agreement is a limited wage-and-hour release and the confidential agreement has a full mutual general release, I think that that's approvable under the circumstances and I'm happy to provide that authority, either now or in a supplemental submission.

THE COURT: Mr. Gutierrez?

MR. GUTIERREZ: Your Honor, I do believe that this only puts -- releases the claims as to the FLSA alone. There are some other incorporated by reference and I do believe that in the other settlement, there's also a carve-out for FLSA. So I do think that both this settlement and the non-FLSA settlement kind of speak to each other in that sense. I do believe that this is -- because of the way that it's drafted, it could -- I can see why your Honor is reading it that way, although, you know, in naming the specific claims, I do believe that it only covers FLSA.

THE COURT: Okay. Again, I'm leery of word smithing and word parsing. But in looking at the

agreement, and again just the FLSA agreement right now as a whole, these sorts of pockets of what appear to be over-broad language when put together, on the whole can suggest that the nature of the release or, as I'm about to address, the nature of the confidentiality provisions may be over-broad. But let me move on to my next point.

We're still on page 2. We're at paragraph -- it's labeled 3(d) as in David. I think it's supposed to be 3(b) because it's right after paragraph 3(a). That may just be a typo. If that's the case, we'll call it 3(d) just to avoid confusion. But this is under the general header of paragraph 3 entitled "claims released by Calderon." And in paragraph 3(d), there certainly appears to be a carve-out that permits the plaintiff to provide truthful testimony relating to government agencies or specific -- either government agencies generally or the EEOC specifically, but there doesn't appear to be any provision to permit statements that are not testimonial but are still truthful. So can you explain to me how this is not -- how this is not an impermissible confidentiality provision?

MR. KATAEV: To the extent that this Court finds it as such, we have no problem fixing the agreement to reflect that. It was just an oversight.

MR. GUTIERREZ: I thank your Honor for pointing it out. It is a typo, it should be 3(b). It does allude to that this release should not prohibit or bar Calderon from making truthful testimony in any legal proceeding or cooperating with any local, state, or federal government agency. So I do believe that that's broad enough in order to participate in not just testimonies but any other legal proceeding. But if your Honor feels that it's too broad or thinks -- estimates that it's too broad, we can certainly shorten it and --

THE COURT: Well, let me -- let me try to explain this a little more carefully. Keep in mind that there is an actual confidentiality provision in the non-FLSA settlement agreement and some of that is spilling over here. My specific issue with this language is that it appears to only allow Ms. Calderon to testify truthfully. First of all, no one has to allow her to testify truthfully. She's supposed to testify truthfully if called upon to do so.

Second of all, if she wanted to make a truthful statement about her FLSA claims and was not put under oath, the language of this provision appears to prevent her from doing that. That is impermissible. That is what I mean. Do you understand the difference?

MR. GUTIERREZ: I do, your Honor, and, you know, I think we can address it with opposing counsel and try to restrict it to FLSA claims and allowing plaintiff to not only testify but also swear under oath. Is that the correct understanding?

THE COURT: Not only testify but also make -- like say the words, make a statement. If she wanted to stand the corner and say, I had FLSA claims, under the terms as written here, that would be a violation of the agreement because she isn't under oath, it isn't a legal proceeding, and she isn't testifying. Do you understand?

MR. GUTIERREZ: Yes, I do.

THE COURT: Okay, all right. Curiously, I had a question about the remainder of paragraph (d) but as we were talking, I actually -- it actually got answered for me, so I'm going to move on.

Next, going back to my question around over-broadness. So on page 4, this is paragraph 14, which is entitled "voluntary agreement" -- titled, excuse me, "voluntary agreement." And here, in paragraph 14(c), it says that Ms. Calderon understands that she is giving up certain rights, including her right to pursue "any claims" against the releases from the beginning of time.

Similarly, in paragraph 14(e), it says that "through this agreement and other related agreement incorporated by reference, Calderon is releasing all of the releases from any and all claims she may have against the releases." So, again, this goes to my -- for the purposes of this FLSA agreement, that just seems over-broad to me because it does not appropriately cabin this agreement to FLSA claims.

MR. KATAEV: I'm prepared to provide the cites to Eastern District decisions and numerous Southern District decisions for the proposition that mutual general release provisions in FLSA cases are permissible where the plaintiff employee is no longer employed by any of the defendants.

THE COURT: What is mutual about the provisions that I just provided, because it speaks only to what Ms. Calderon is doing.

MR. KATAEV: I agree that the way it's written needs to be fixed.

THE COURT: Okay.

MR. KATAEV: But the point --

THE COURT: That's fine. I'm not -- I'm not contesting the general proposition that mutual general releases are permissible under particular circumstances and worded correctly. I understand that. I'm talking

about the words that are in front of me here because that's what I have (ui).

MR. KATAEV: Fair enough. That's something that we need to sharpen our pencils.

THE COURT: However you write it, sure. Fisher says I can't write it for you. There's that. Okay, so that's the FLSA agreement.

Now, I realize that it is an unsettled question as to whether or not review of the non-FLSA agreement is within the scope of Cheeks review. The Second Circuit has yet to opine. My distinguished colleagues on the bench have varying views on whether or not it's permissible and you've heard in part my views at the conference where I asked you to provide the non-FLSA agreement.

So here's what I would say: My primary concern with this agreement has to do with -- now I'm on document 79-1 -- has to do with paragraph 5, which is the confidentiality provision. Now, I do see that it provides an exception to allow for statements or disclosures of information unless it's prohibited by law or it relates to FLSA claims. So that was a very carefully done carve-out and I see where you were going with that. It's the last sentence where I'm having an issue because it serves to -- it appears to cover again

this whole non-testimonial, truthful statement around FLSA claims.

MR. KATAEV: Can I trouble the Court for the paragraph again?

THE COURT: Sure, I'm sorry. We're at document 79-1, page 5, paragraph 5, and it's paragraph 5(a).

MR. KATAEV: Okay. Just for the record, I don't have 79 because it's sealed and it was filed by someone other than me.

THE COURT: Sure.

MR. KATAEV: But I do have the final agreement that I'm working off of so I do see it now, thank you.

THE COURT: Okay. Mr. Gutierrez, you are back.

MR. GUTIERREZ: Sorry, I don't know what I pressed. I do believe that we sent all sealed documents to opposing counsel the date that it was filed.

THE COURT: Okay.

MR. GUTIERREZ: Just so that your Honor knows.

THE COURT: The reason why I think it is problematic as to the FLSA claims is because this last

sentence refers to asking the plaintiff regarding "the dispute between her and the defendants." That covers FLSA claims and we've already talked about her ability to make truthful, non-testimonial statements. So this particular sentence in conjunction with what we discussed earlier, that is definitely deemed to be impermissible. I know because I've looked at this extensively and had extensive conversations with counsel about it.

MR. GUTIERREZ: We were worried that your Honor issued Yuganala (ph) around the date that we were submitting this for your Honor's review, so we tried pick up the carve-out on the FLSA. But if your Honor estimates that it's still too broad, I'm happy to discuss with opposing counsel a new proposal that specifically erases the statements as to which -- or just erases that part or leaves it only for the non-FLSA claims.

THE COURT: Yeah. And just so you know, I had a similar hearing in Yuganala before I issued that decision and they submitted a revised agreement. So the written decision reflects an extensive conversation with counsel and then them discussing it amongst themselves. Okay.

MR. KATAEV: May I make a proposal for

everyone to consider? We don't have to decide now but in 5(a), we have -- the first sentence says, "except as otherwise prohibited by" --

THE COURT: Hang on. I don't want you to do this with me here because this is involving an agreement that --

MR. KATAEV: Sure.

THE COURT: Again, the only reason I'm raising this is because I think it negatively impacts the fairness of the FLSA settlement. So to the extent that you all want to attempt to negotiate something else for the non-FLSA agreement, that's fine. I just -- I would not like to be privy to those conversations. I'd like to see what your end product is.

MR. KATAEV: Okay.

THE COURT: Okay, let's see. Going back to page 3 of document 79-1, paragraph 3(a). The last part of this paragraph, I think it's the last three or four lines, which I won't quote but as worded again appear to cover FLSA claims because it's referring to the types of claims that are being released. To your earlier point, Mr. Kataev, again, I don't -- I don't see the mutuality of this. And, again, it's only because it negatively impacts the FLSA settlement. That is the only reason that I'm flagging it. It

otherwise would not play a role here.

MR. KATAEV: Understood. We'll sharpen our pencils, as I said.

THE COURT: All right. So that was -- and then finally --

MR. GUTIERREZ: Your Honor?

THE COURT: Yes.

MR. GUTIERREZ: Just to make sure that we are on the same page, your Honor is saying that this 3(a) needs to be mutual? Is that the issue or the issue is as it pertains to --

THE COURT: No, the issue is that it's over-broad.

MR. GUTIERREZ: Okay.

THE COURT: It's the same over-broadness that I discussed with the FLSA settlement agreement in that it appears as though the release covers far more -- it appears to cover FLSA claims.

MR. GUTIERREZ: So it has to carve out FLSA claims.

THE COURT: Well, I mean, you have a whole separate agreement that carves out FLSA claims.

MR. GUTIERREZ: Right.

THE COURT: So yes. Now, I actually do want to go back to the confidentiality provision because in

your letter motion at document 78 on page 2, you have -- you actually state that you all disagree about the confidentiality provision. So I probably should have started with that because this is styled as a joint motion, yet on a very important provision of your settlement agreement, you appear to not be moving jointly.

Let me start with Mr. Gutierrez. The agreement is (ui) so I'm confused.

MR. GUTIERREZ: Yes.

THE COURT: Are you agreeing or not?

MR. GUTIERREZ: I just want to start out by saying that our client is prepared to settle this matter. Can you hear me?

THE COURT: Yes.

MR. GUTIERREZ: Our client is prepared to settle this matter today and if we raised the issue, it was because around the time that we were submitting this for your Honor's review, we realized that the confidentiality piece might not be in compliance with McClaren (ph), which is a case out of the NLRB and states that plaintiffs may not be -- may not agree or it's unlawful to agree to a confidential agreement that does not permit plaintiffs to address their Section 7 rights.

And we realize that and we -- in all candor, we wanted to bring it to the attention of the Court to see what your Honor thinks about that specific case or if your Honor has anything to say about that. But as I said, we are ready to settle this matter as it is, with the corrections that your Honor has told us to do, which we would be happy to do. This is a non-FLSA matter and a non-FLSA agreement was not bound by Cheeks, but the fact that the NLRB has stated -- expressed the unlawfulness of such confidentiality agreements, we felt it was our duty to report it in all candor to the Court.

THE COURT: Understood.

Mr. Kataev, Mr. Sherman, did you want to be heard on this point?

MR. KATAEV: I rest on the papers. I think I've addressed it sufficiently there.

THE COURT: Mr. Sherman?

MR. SHERMAN: Yes, your Honor, I have nothing further to add.

THE COURT: Okay. Thank you for bringing it to my attention. However, it appears that there's no longer an issue or a controversy in light of your representations, Mr. Gutierrez, that the confidentiality provision in the agreements that have

already been executed is something that your client has already accepted. So I don't -- if you're not disagreeing about it, I don't know that there's an issue for me to decide here. We've already discussed that confidentiality provision. I just wanted to understand whether or not the parties still had a disagreement and it does not appear that they do, so I'm going to move past that. All right.

Final thing with the non-FLSA agreement, if I can just go back to 79-1, and we're at page 6, paragraph 15. Paragraphs 15(b) and (d) have the same language as paragraphs 14(c) and (e) in the FLSA agreement, but you all are going to go back and work through that. Okay.

So let's talk about next steps. I think that -- again, the Second Circuit has indicated what the options are here. As counsel has indicated, they appear prepared to go back and have a discussion about the particular terms that were discussed during this hearing, so I will give you time to work on that. Because we've gone through this extensive analysis, any documents that you submit later we'll be able to act on very quickly, having just to look at a few specific pieces of the puzzle here. So how much time do you believe that you all need to go back and have a

discussion and resubmit?

MR. GUTIERREZ: Your Honor, with opposing counsel, I think two weeks is a reasonable time. I don't know what opposing counsel believes.

THE COURT: Opposing counsel?

MR. KATAEV: December 15th just to give us some more cushion?

THE COURT: Mr. Sherman?

MR. SHERMAN: That's fine with us, your Honor.

THE COURT: Okay, sure, then Friday, December 15th. You don't need to file another motion. Just file a supplement. And it should attach -- to the extent that you are changing the documents, attach the new document. If you want to provide a letter, you can, but it's fine if you're just providing the document. If you are also changing the sealed document, the non-FLSA agreement, then that should be filed separately under seal. If you are choosing not to change either document, then I definitely need a letter explaining why and your authority for doing so, all right?

Anything else -- actually, one second. Okay. Just to round out this conversation, I do note that neither provision has any of the definitely

impermissible provisions such as a non-hire provision because it's not applicable here. And because the attorneys' fees are not being provided as part of the wage-and-hour settlement, I couldn't really opine on the reasonableness of them at this point. So pursuant to the non-wage-and-hour agreement, I know that there is a retainer. Even assuming I was considering all of that, it would not offend the wage-and-hour portion of this settlement.

Then finally, I believe that the agreements provide that the Court retains jurisdiction until the payments are completed. I think that that is -- that's certainly in the FLSA agreement and I know that that is a payment to be made relatively quickly. It's just one payment. To the extent that there are other payments to be made in the non-FLSA agreement, whether or not the Court retains jurisdiction or not, that's really a decision for Judge Komitee because he's currently the presiding district court on the case.

Anything else on your end? Let me start with the defense. Mr. Sherman?

MR. SHERMAN: No, your Honor. Thank you for your time.

THE COURT: Mr. Kataev?

MR. KATAEV: Nothing further. Thank you for

your thorough attention to the agreement.

THE COURT: Sure.

Mr. Gutierrez?

MR. GUTIERREZ: Just in regard to the non-FLSA agreement, would the Court be willing to retain jurisdiction because there are two other payments on the non-FLSA settlement. Would the Court be open to retaining jurisdiction until those payments are made?

THE COURT: Well, again, the question of whether or not the Court retains jurisdiction is not mine because my sole purpose here is to decide the motion. The jurisdiction over the case and whether or not there should be a stipulation of dismissal filed immediately upon the motion being approved, that's outside of my purview in deciding this particular motion. In cases where the parties do consent, I typically would not retain jurisdiction. But, again, that's not a decision for me to make with this motion. Does that address your question?

MR. GUTIERREZ: Sorry, I'm trying to go back and forth. Would it be okay if we were to file a letter (ui) stating that -- sorry. Would it be okay to file a new letter motion in that case so that the Court retains jurisdiction or does your Honor think that supplementing would be sufficient?

THE COURT: Again, I do not know the answer to that. That is a question that would have to be addressed to Judge Komitee. I know that what I want you to file is a supplement to your current motion. If you want to file a supplemental letter motion about that, you can do that. Just remind me, because I feel like now I'm looking at the Spanish version of the document so I can't find the version that I'm looking for. I can read Spanish but not that quickly.

MR. KATAEV: It's all Greek to me, your Honor.

THE COURT: Yes.

MR. GUTIERREZ: It's three payments, your Honor. It's three payments. The first payment -- is that what your Honor --

THE COURT: I found it, I found it. Okay, I understand, okay. Yes, I did find it. Okay, I see what you're talking about. I think you should focus on getting your motion approved first because it hasn't yet been and you need to file a supplemental. Otherwise, it can't be. So focus on that portion of it and then we'll go from there, all right? Okay.

Anything else, Mr. Gutierrez?

MR. GUTIERREZ: No, thank you, your Honor.

THE COURT: Thank you all very much for your

preparation and your engagement in this conversation. With that, this conference is adjourned and I will look for your supplemental filing on or before December 15th. And if I don't speak to you before then, everyone have a happy and healthy remainder of 2023.

MR. KATAEV: Thank you, your Honor. Happy Holidays.

MR. GUTIERREZ: Thank you, your Honor.

MR. SHERMAN: Thank you, your Honor.

* * * * * * *

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.



ELIZABETH BARRON December 1, 2023